UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA    )    DOCKET NO. 3:25-CR-321
                     )
       vs.           )
                     )
OMAR NASEER ABDULRAZZAQ    )
AL-ABBASI,              )
                     )
         Defendant.    )
_____)

TRANSCRIPT OF ARRAIGNMENT AND DETENTION HEARING
BEFORE THE HONORABLE SUSAN C. RODRIGUEZ
UNITED STATES MAGISTRATE JUDGE
DECEMBER 29, 2025

<u>APPEARANCES</u>:

On Behalf of the Government:

    KIMLANI M. FORD, ESQ.
    United States Attorney's Office
    227 West Trade Street, Suite 1700
    Charlotte, North Carolina 28202

On Behalf of the Defendant:

    RODERICK M. WRIGHT, JR., ESQ.
    Roderick Wright Law Firm, PLLC
    19109 West Catawba Avenue, Suite 200
    Cornelius, North Carolina 28031

Digitally recorded proceedings transcribed by:

        Cheryl A. Nuccio, RMR-CRR
         Official Court Reporter
        United States District Court
         Charlotte, North Carolina

I N D E X

DEFENDANT'S WITNESSES                                    PAGE

ELVIRA AL-ABBASI

  Direct Examination By Mr. Wright            20
  Cross Examination By Ms. Ford               27

P R O C E E D I N G S

(Transcript of proceedings digitally recorded on December 29, 2025.)

THE COURT:  Good morning, everyone.

MS. FORD:  Good morning.

MR. WRIGHT:  Good morning.

THE COURT:  Ms. Ford, how are you?

MS. FORD:  I'm good.  Thank you.

THE COURT:  Good.

Mr. Wright, how are you?

MR. WRIGHT:  I am well, Your Honor.  Thank you.

THE COURT:  Good to see you.

All right.  We're here in the matter of United States versus Al-Abbasi.  We're here for the defendant's arraignment and also his detention hearing today.

Mr. Wright, why don't we go ahead and do the arraignment first.  If you'll come on up to the podium.

Has the defendant received a copy of the bill of indictment?

MR. WRIGHT:  Yes, Your Honor, he has received a copy of the bill of indictment.

THE COURT:  Does he wish to waive formal reading?

MR. WRIGHT:  He does waive a formal reading.

THE COURT:  And how does he wish to plead?

MR. WRIGHT:  He tenders a plea of guilty to all --

excuse me.

THE COURT: Not guilty.

MR. WRIGHT: He tenders a plea of not guilty to all charges. Asks for a trial by jury. He's aware of the statutory maximum penalties that apply to each charge.

THE COURT: All right. Very good.

A plea of not guilty will be entered on your behalf. The record will reflect you've been arraigned. All the rights that you heard from the magistrate judge at your initial appearance still apply to you. I will just go over a couple of things, though.

To the extent that you are not a U.S. citizen, I'll instruct counsel for the government and your defense counsel to consult on any required consular notifications under Rule 5.

In addition to that, I'm going to give the *Brady* obligation instruction to the government. I'll direct and remind the government to comply with its obligations under *Brady versus Maryland* and the cases that followed thereafter. Of course, failure to do so may result in sanctions against the government.

Sir, all that means for you is there was a Supreme Court case decided back in the '60s. It requires the government to disclose certain information to you like exculpatory information. They must do that in a timely manner

so I am required to go over that with each criminal defendant because now it's part of the criminal rules. Okay.

All right. Mr. Wright, what about detention matters? Does the defendant want to be heard?

MR. WRIGHT: Yes, Your Honor.

THE COURT: Okay. Ms. Ford.

MS. FORD: Thank you, Your Honor.

The government is moving for detention in this case and agrees with the recommendation of probation that there are no conditions or combination of conditions that would ensure the safety of the community. I am not going to argue that he's a flight risk, although I might mention some things that --

THE COURT: We'll start there. This is a presumption case, is it not?

MS. FORD: No, it's not.

THE COURT: It is not.

MS. FORD: No.

THE COURT: Okay.

MS. FORD: He's charged with four counts of receiving and distributing obscenity --

THE COURT: Okay.

MS. FORD: -- and one count of possession --

THE COURT: It's a different section. Got it.

MS. FORD: One count of possession of child

pornography, but in --

THE COURT: All right. Just so everybody's on the same page. It's not a presumption case, then.

MS. FORD: Correct.

THE COURT: And now that I've looked at what has been alleged here, I agree with that. Okay. Very good.

MS. FORD: And in my presentation, Your Honor, I'm going to touch upon several of the factors that Your Honor is to consider, including the nature and circumstances of the offense and whether the offense is a crime of violence and/or involves a minor victim, which it does, the history and characteristics of the defendant, and the weight of the evidence. I'm going to start with the weight of the evidence so Your Honor knows what this case is about.

The case started with two cyber tips from Kik. Kik reported to the National Center for Missing & Exploited Children that the Kik user Jaymay321 had shared child pornography videos with another Kik user on July 2 of 2024 and July 9 of 2024. In the cyber tip Kik identified the email address of king_omar23@yahoo.com as associated with the Kik user Jaymay321 account.

Once law enforcement began investigating the cyber tip, I mean, the first question was who is Jaymay321? And I actually might have it reversed. It might be Jaymay231. But -- so the question became who is that Kik user? And

during the course of the investigation, my office issued many grand jury subpoenas to try and answer that question. And basically, we discovered that the Kik user Jaymay321, like Kik said, was associated with this email account king_omar23.

We discovered that there was a Cash App account associated with that email address and that that Cash App account had been opened in the name of Omar Al-Abbasi.

There was also a JPMorgan Chase bank account associated with the Cash App account and that JPMorgan Chase account was associated with a customer named Omar Al-Abbasi with an address in Monroe. The email address associated with the JPMorgan Chase account was theguy19881@gmail.com.

The JPMorgan Chase grand jury subpoena also showed that on July 2, which is the date that one -- that Jaymay321, the Kik user, shared child pornography, that someone accessed this JPMorgan Chase account from the same IP address that the Kik user had used to share the child pornography.

That email address that's associated with the JPMorgan Chase account, theguy19881@gmail.com, is registered to Omar Al-Abbasi.

We issued a grand jury subpoena to Apple for both email accounts, the king_omar23@yahoo account and theguy19881@gmail.com, to see if there were any Apple accounts associated with either or both of the emails and there were. There was an Apple account associated with

king_omar23@yahoo.com in the name of Omar Naseer and an Apple account associated with theguy19881@gmail.com in the name of Omar Al-Abbasi.

So at this point we were pretty sure that this defendant was the person associated with the Kik account Jaymay231 or Jaymay321.

Mr. Al-Abbasi was working for a contractor for the DOD and stationed or living at the Guantanamo Bay Naval Installation in Guantanamo, Cuba, during our investigation, but his last known address before he started living on the island was an address in Monroe, North Carolina.

So once the investigation determined it was likely that he was the suspect, authorities on the naval installation in Guantanamo Bay, Cuba, conducted a search warrant at his residence and seized a laptop from the residence. A forensic examination of the laptop showed that there were four child pornography videos on the laptop. That the owner of the laptop was associated with theguy19881@gmail.com email address. There is other evidence on the laptop that it belonged to and was used by the defendant. There were chats on the laptop that I'll get into in a minute.

Law enforcement conducted two interviews with the defendant during the course of the investigation. He was *Mirandized* both times. And although he never explicitly admitted to distributing or receiving child pornography

intentionally, he made several admissions that were helpful to the government's case. He admitted that he was on the island during the regular time period. That his main email account was theguy19881@gmail. He said that he used Viber to chat with people, which I'll talk about in a minute. And he made several statements with relation to Kik that were helpful.

We also issued a search warrant to Kik for the contents of the Jaymay231 account and in the return were messages between Jaymay231 and other Kik users between May and July 15 of 2024. There were other users -- the messages show that there were other users offering to sell child pornography to Jaymay231 and that he would ask them how much and for samples and describe what he wanted. There were also chats that showed that the defendant sent three child pornography files to other Kik users.

The three distribution of obscenity counts come from the Kik records that show the Jaymay231 account sending child pornography files to other users and then the receipt count covers other users offering and selling CSAM or child pornography to the defendant.

The records also showed that he was a member of various Kik groups that would indicate an interest in child pornography. For instance, he was a member of a group called Kids CP, Rap Pedo Links, Hot Rape Under Teen, Youngest Kids, Young Hot Pedo, Under Kids Folder, Child Porn, just to name a

few.

But one thing I said I would talk about in a minute is that on the laptop, the forensic examiner recovered these chats in the -- in an application called Viber, and we discovered that he was chatting using Viber with -- it turned out it was a former ex-girlfriend, and the Viber chats occurred between July 30, 2017, and February 20 of 2018. And law enforcement has interviewed this ex-girlfriend and she reviewed the contents of the chat and authenticated them. Said that that was his user name and her user name. At the time they were dating. They are no longer dating.

But during the chat -- one of the chats, the defendant asked this former girlfriend about the fact that her father had sexually abused her. While they were discussing the sexual abuse, the defendant stated, "Hmm, if I bring," and then he names a family member, "to visit us, would you help sissy do this to her? I mean, I'm sure sooner or later a white guy gonna fuck her or what you think?"

In response the girlfriend said, "You want to fuck your own family member?"

And the defendant replied, "Well, sooner or later a white guy will fuck her pussy, but would you help me, my love?" And he goes on to say, "I would just maybe eat her pussy and have her only like white guys."

The ex-girlfriend said, "That would get you in so

much trouble and you would wind up in prison probably and in America it's hard to get away with that shit."

The family member that they're discussing that he's talking about having sex with is a child -- or was a child at the time approximately --

THE COURT: Is it one of the two that was at the home?

MS. FORD: No, it is not.

THE COURT: Okay. It is not.

MS. FORD: It is a child -- at the time of this discussion, the child was between 6 and 7 years old.

In a later conversation between the defendant and the ex-girlfriend, he sent a message saying, "Show me some teens."

And in response the girlfriend sent several videos which we did not recover followed by the words, "Terrorizing her young innocent pussy and just like you like em, baby."

And the defendant responded, "Yes, baby, it's hot."

Later in the chat the defendant commented, "I hope you don't of me as pedo because I asked for young. Maybe I am a britches pedo."

And she replied, "What's a pedo?" And then, "Oh like pedophilia?"

And he said, "Yes."

So that is basically the government's case against

the defendant, Your Honor.  And in light of the nature and circumstances of the offense, the weight of the evidence, and his history and characteristics -- and I mentioned the chat just because, you know, a child pornography case in and of itself is alarming, but then when you add in these chats where he's discussing with someone having sex with a minor, a family member, it becomes even more alarming.  And I agree that there are no conditions or combination of conditions that can ensure the safety of the community and would ask that you detain him.

THE COURT:  All right.  Thank you.

Mr. Wright.

MS. FORD:  Oh, there is one thing I want to mention real quick, Your Honor.

THE COURT:  Yes.

MS. FORD:  His -- he was at Guantanamo during the relevant time period.  His wife would periodically come down to visit.

THE COURT:  Okay.

MS. FORD:  And she was there with him at his -- and visiting Cuba during some of these times when he was distributing child pornography.  I'm not saying she knew about it, just that she was present and around.

THE COURT:  Wait, when you say distributing --

MS. FORD:  Uh-huh.

THE COURT:  -- tell me a little bit more what you

mean by that.

MS. FORD: So it's in -- in the indictment it's the obscenity counts. I keep calling it child pornography, but it's pretty --

THE COURT: 1466A(a)(1) --

MS. FORD: Yes.

THE COURT: -- is that what you're referring to?

MS. FORD: Yes.

THE COURT: Count one --

MS. FORD: Uh-huh, count one --

THE COURT: -- count two, and count three.

MS. FORD: Yes, those three are the distribution of obscenity counts.

Based on the messages that were returned by Kik, there was -- the defendant on May 26, 2024, sent another Kik user a media file that showed a prepubescent female fully nude sitting on her knees in front of an adult male who rubs his penis and ejaculates on the child's face. That's count one.

Count two covers conduct on July 2 when the defendant as Jaymay231 sent another Kik user a media file that showed a prepubescent female who appears to be 5 to 7 years old performing oral sex on an adult male's penis. At the end of the video the adult male touches his penis in front of a child.

Count three involves conduct on July 9, 2024, when

Jaymay231 sent another Kik user a media file which was the same as the first file I described in count one. He just sent it to a different Kik user.

Count four covers receipt for when he solicited and then actually received at least two child pornography files.

It's charged as obscenity because it happened in Guantanamo Bay and we can't charge the child pornography offenses because there is an interstate or foreign commerce requirement which we couldn't prove because of where he is. However, the child pornography, the possession of child pornography count covers the four child pornography videos that were on his laptop that he possessed while he was living in the housing that was on the installation that is leased from Cuba.

Did that answer Your Honor's questions?

THE COURT: It does. Thank you.

MS. FORD: You're welcome.

THE COURT: All right. Mr. Wright.

MR. WRIGHT: Good morning, Your Honor.

Since the government said that they're not arguing flight risk -- obviously, I can't do too much argument with respect to the government's statement as far as their strength of their case. These are obviously things that I'm just hearing this morning. There will probably be -- we'll obviously probably have to get some experts of our own to

evaluate these things.

But with regard to the flight risk, even though they're not alleging it because I thought it would come up, especially since he was born in another country, I do want to note that it's -- it's important to note that he rescinded his citizenship in the foreign country. He began working with the military when he was 15 years old filling sand bags, working on the base. Started working as a contract litigator for the Marines way back in 2006. He's gone on combat missions. He's gone into the ground in dangerous situations. His wife provided me with a bunch of letters of commendation for his work in placing his own self in jeopardy in order to save U.S. lives.

Your Honor, he also became -- he migrated -- immigrated to the U.S. legally in 2010 so he did not come into this country illegally. He also became a naturalized U.S. citizen in 2016 and at that time renounced his citizenship in Iraq. He has family here. He is a homeowner. He purchased his home in 2022. He's worked for several -- he's worked for several contractors for the Department of Defense.

Even after this instance came up when they executed the search warrant, served -- I think it's important to note his conduct at that time. He was cooperative. He spoke to them freely. He handed over all his devices freely. He provided all passwords to all his documents. I think when

they gave him an inventory of everything they seized, they had missed his thumb drive. He even -- he even said, "Well, you don't have the thumb drive" that they had missed. They went and acquired that. Even after that -- he was relieved of that position. He was then hired after these alleged offenses with the Department -- with a contract for the Department of Defense again and was doing some more work.

Also, his conduct --

THE COURT: Let me stop you right there for a second. A couple of questions.

So the address was at Monroe. There are minors that currently live there; is that correct?

MR. WRIGHT: Yes, Your Honor.

THE COURT: Okay. And is that the only place you're proposing for him to live at this point or do you have an alternative?

MR. WRIGHT: We have a lot of alternatives.

THE COURT: Okay.

MR. WRIGHT: One, the two children --

THE COURT: What specifically?

MR. WRIGHT: Okay. He's not the -- he's the stepparent of the two children.

THE COURT: Uh-huh, I understand that.

MR. WRIGHT: Their mother is present in the courtroom. She has other family members that if he goes back

to that residence, there are aunts and other family members in the area that they can stay with. They could also stay -- the mother doesn't stay at that address. They can also stay with the mother -- she's working and commuting. They can stay with the mother. So if the Court has any concern with the children being in the house, they can make arrangements for him not to be in the same house with the children.

THE COURT: Okay. But now you're talking about moving the children out of the house.

MR. WRIGHT: Well, there's -- either he can --

THE COURT: I'm not sure that I would want to do that. What alternatives does he have to live outside of that home? Does he have an alternative?

MR. WRIGHT: He can get -- he can arrange another place. I don't know if he can stay with them. I don't know if he can stay with -- I was going to call his wife as a witness with regard to some of those alternatives, Your Honor, depending upon what was of high concern to the Court.

THE COURT: Happy -- happy to hear from you on that, but -- if you want to call her, but I am looking -- what are you proposing in terms of living? Where would he live? The Court's got a real concern about him living with any minors, whether they're his biological children or his stepchildren. The Court would have a real concern about that. So you can address that.

In addition, I need to know a little bit about what the current work situation is. Is he still traveling?

MR. WRIGHT: No, he was working for Home Depot, Home Depot headquarters, doing armed security. He was actually approached while he was at work.

THE COURT: Well, you just mentioned another contract and so I wasn't sure --

MR. WRIGHT: Oh, no, no, no.

THE COURT: -- if you were going -- okay.

MR. WRIGHT: He's home now.

THE COURT: Okay.

MR. WRIGHT: He's back from that. He's working at Home Depot headquarters as armed security. He was approached at work. He cooperated. Relinquished his firearm. Obviously, he wouldn't be able to go to that same employment because I'm sure as a condition of his bond he would not be allowed to possess weapons so he wouldn't be able to do an armed security type situation.

THE COURT: Yes.

MR. WRIGHT: There's -- he's always worked. That's one thing his wife was adamant about. He's always -- since he was 15, he's always steadily worked whether he has to Uber, work security, he's doing contractor jobs.

THE COURT: Uh-huh.

MR. WRIGHT: The house can be arranged for no

computers to be located on the property. Even if there's cell phone questions, they can arrange for cell phones with no internet -- with no internet access.

The reason I don't have a specific proposal because in speaking with him at length, speaking with the wife, they basically -- they gave me about 20 different alternatives and so it's whatever the Court felt concerned about, we discussed various options almost, basically, waiting for Your Honor to say which option would Your Honor feel more appropriate with. They're prepared to make adjustments and movements to give the Court confidence in the safety of the community.

Usually I have one option available. She gave me about ten. She's like however they want to address it. If they don't want him to have this, if they want him to work, he can do this. If they don't want him -- you know, obviously he can't possess a weapon. Whether he's driving. If he can't work from home because that would require a computer and the Court doesn't want him to have computer access, there are other jobs that he can do that don't require that. They have an extreme level of flexibility. Strength in the family.

CPS did come out and do an interview in May. They were cooperative with that. They interviewed both children. They interviewed the mother. There was no displacement or anything needed with that. Again, these charges came up originally -- Your Honor can see the dates going back some

time. It's been over a year. He's been spoken to, again, a couple of times. He had his passport. His wife did also bring his passport to court today. He'd be prepared to surrender his passport. He actually wouldn't even be able to go back to Iraq. He would be considered a traitor with the work that he was doing so that would not even be a safe option. But I did have his wife bring his passport because I know surrendering that would be -- would be important also.

THE COURT: Okay. Yeah. I wasn't so concerned about Iraq or the flight risk. The government has already talked about that. I was --

MR. WRIGHT: The children --

THE COURT: -- more -- the children is the concern. And then also, if he still has work in Cuba, that would be a concern for me.

MR. WRIGHT: He does not.

THE COURT: But you just answered that question.

Okay. Anything else you'd like the Court to know?

MR. WRIGHT: No. Could I call the wife to address the concerns about where the children would be?

THE COURT: You may.

Come on up and be sworn.

ELVIRA AL-ABBASI, DEFENSE WITNESS, SWORN,

DIRECT EXAMINATION

BY MR. WRIGHT:

Q.    Good morning.  Could you please state your name and your relationship with the defendant.

A.    Good morning.  My name is Elvira Al-Abbasi.  I'm Omar's wife.

Q.    And you've heard us when we were talking about the two children?

A.    Yes.

Q.    Okay.  Who are those two children?

A.    My two daughters.

Q.    Okay.  And how long have you been in a relationship and married to Mr. Al-Abbasi?

A.    I met Omar in January 2020.  We've been together ever since then.

Q.    And what's his relationship like with the two children?

A.    They interact.  They bonded very well since the very beginning.

        May I read the letter I prepared?

            THE COURT:  You're welcome to read it.  Although, if you want to just enter it as an exhibit, I'm happy to just read it on my own.  I don't know if there's anything that needs to be read into open court.

            MR. WRIGHT:  Whichever the Court would prefer.

            THE COURT:  And I just also remind you, you know, this is open court so to the extent we're talking about minors and things like that, just use their initials so that we're --

THE WITNESS:  Okay.

THE COURT:  Because we're in open court.

It's up to you.  I mean, I'll take it as an exhibit if you'd like and you can just keep questioning her.

MR. WRIGHT:  Okay.  Do you have a copy?  You have a copy, correct?

THE WITNESS:  I do -- I do have a copy.

MR. WRIGHT:  Okay.  Do you want us to give a copy to the U.S. attorney also?

THE COURT:  Yes, please.

MR. WRIGHT:  I think she brought two copies.  She has two copies with her, Your Honor.

THE COURT:  And, Mr. Wright, if you want to approach to get that copy, you may.

MR. WRIGHT:  If I can hand them to Your Honor?

THE COURT:  Yes.

(Document tendered to the Court.)

THE COURT:  Thank you, sir.

We'll mark this as Defense Exhibit 1.

MR. WRIGHT:  Yes, Your Honor, please.

THE COURT:  Okay.  Any objection to that, Ms. Ford?

MS. FORD:  No, Your Honor.

BY MR. WRIGHT:

Q.   Now, you understand that the Court's primary concern that's been addressed here this morning is really in terms of

the safety of those girls.  What kind of options do you have available to -- as far as him not being in the same household as those girls?

A.    My mother and my three sisters live within a 20-, 30-minute radius from the home.  Whenever Omar was deployed, they always helped me out with the kids, taking them to school, bringing them back, staying with them.  So I know for a fact they can help out with this -- in this situation as well if I explain we need it.

Q.    So it would be your preference for him to stay at the home or him to stay with one of those people?

A.    Either way.  It will be -- we're flexible on either one of those options.

Q.    Okay.  So you're saying with those people, within 20, 30 minutes they could stay with either one of --

A.    Yes.

Q.    Either one of those people?

A.    Yes.

Q.    And also, if preferred, he could stay with one of those people?

A.    Absolutely.

Q.    But if he was staying with those people, I guess one of them would then assist in the home?

A.    I'm sorry?

Q.    What would be -- what do you think would be the best

placement situation for him not to be in the same home as the two girls?

A.   I think one of my sisters can keep the girls until this is resolved properly.  They will continue going to the same school unless they stay with me in Georgia while I'm there for work, but I do commute.  I can come back every day.  Before 3:00 PM I'm always home.  That's the time when they're in school anyway.  Either option.  We're flexible.  My family is very supportive.  They're willing to help with whatever accommodations are needed for this.

THE COURT:  So you're traveling for work a lot right now.  How often is that?

THE WITNESS:  It just depends if it's a Monday through Thursday or Tuesday through Friday shift.  I'm there in Georgia from 6:00 AM -- I go in at 6:00 AM.  I get out at 1:30 PM.

THE COURT:  Okay.

MR. WRIGHT:  All right.  Any other questions about as far as the placement options, Your Honor?

THE COURT:  Do any of the other homes that you've talked about, do they have minors as well?

THE WITNESS:  Two of them, yes.

THE COURT:  Okay.  I think if you're serious about proposing this, I need a little bit more detail about who's going where, what you're proposing.

MR. WRIGHT: Okay. I think the proposal, as I understand it, is for him to stay in the home that they're purchasing.

THE COURT: Okay.

MR. WRIGHT: For him to stay in the home that they're purchasing. And so the address, the Monroe address is where he would stay. That the girls would stay with either one of the aunts or the sister -- is it a sister?

THE WITNESS: My sisters.

MR. WRIGHT: The aunts that they frequently stay --

THE WITNESS: And my mom. My mom is in the area as well.

MR. WRIGHT: That they frequently --

THE COURT: You're traveling a lot.

MR. WRIGHT: Right. So he's primary -- he's primary caregiver.

THE COURT: Who's watching over these girls?

THE WITNESS: My sisters.

THE COURT: Okay.

MR. WRIGHT: So when he's working they're watching them anyway. They could maintain the same school. It's just that that's -- they're used to being at those locations also.

THE COURT: Okay.

MR. WRIGHT: And she's not there. So as them still -- again, that's a home that they've been purchasing.

It would be for him to stay there and the girls to stay where they frequently stay with the aunt or the sister, whichever address, but it would not be difficult for them to maintain their situation, maintain their current schools and him being in the residence as far as the Monroe residence and that way there would be no -- there actually would be no one in the home but him.

We'd be amenable to anything.  Obviously, a restriction that no children go into the home.  That obviously she could -- she would be back and forth, but that he would -- they'd be agreeable to any type of ankle monitor if the Court thought that was agreeable.  She even said if the Court feels like he needs some adult supervision, his mother could come move in with him if you wanted someone on site to watch over him.

THE COURT:  Okay.  Why don't we save -- this is very helpful to the Court, but why don't we save some of that for argument.

MR. WRIGHT:  Okay.

THE COURT:  Anything else you want to ask this witness?  Otherwise, we'll turn it over to Ms. Ford.

MR. WRIGHT:  Okay.  No, I think that's it, Your Honor --

THE COURT:  Okay.

MR. WRIGHT:  -- as far as the children.  Thank you.

THE COURT: Okay. Ms. Ford.

CROSS EXAMINATION

BY MS. FORD:

Q. Do your family members know what he's charged with?

THE COURT: Why don't you stand up, come over to the podium, please.

Q. Do your family members know that he's been charged with distributing videos and images that show children engaged in sex acts?

A. Yes.

Q. Do they know that these videos and images are of children approximately the same ages as your children?

A. I can't say exactly what. We didn't get that information either.

Q. And does he have contact with the family member who's in Mississippi?

A. I'm not sure who you're talking about.

Q. His daughter.

A. He does have contact with his daughter.

Q. In person or over the phone or something else?

A. I believe they text, as far as I know.

Q. Do they see each other?

A. No.

Q. And in 2017 that child would have been about 6 or 7, correct?

A.   I did not know Omar at that age -- at that time.

Q.   And according to your letter, you were in Guantanamo during June -- July of 2024?

A.   Yes.

Q.   And do you realize that the government is alleging he committed this conduct while you were there?

A.   I understand.

        MS. FORD:  I don't have any further questions, Your Honor.

        THE COURT:  All right.  Thank you.

        MR. WRIGHT:  No, Your Honor.

        THE COURT:  Okay.  Thank you.  Thank you for your testimony.  You may step down.

        (Witness stepped down.)

        THE COURT:  Mr. Wright, I'll hear further from you on the argument part.

        One just issue, though.  I'm trying to see in this letter, there are some things in here that might need to be under seal.  Are you moving to seal this exhibit?

        MR. WRIGHT:  Yes, Your Honor.

        THE COURT:  All right.  Any objection to that?

        MS. FORD:  No, Your Honor.

        THE COURT:  All right.  I'm going to go ahead and seal this character reference letter due to some of the information it contains related to minors and other issues

therein.

So, Madam Clerk, we'll put this on the record as Defendant's Exhibit 1 under seal.

All right. Mr. Wright, I'll hear from you.

MR. WRIGHT: Thank you, Your Honor.

And obviously, we understand the Court's concern. I know typically it would be a situation if she was permanently in North Carolina and consistently there, then it would be a situation where he would be leaving the home and finding another location. But with the setup and the way the girls move, it would actually make more sense for them to be with the aunt or the sister at this time. Now --

THE COURT: I've got to tell you. I mean, you could read it on my face, but I've got a lot of concern about this. So we're taking a situation where we're removing two minors from their home, putting them somewhere else for the benefit of defendant. I've got to tell you, that feels just -- it feels really strange to do that.

In addition, I've got a lot of concerns. I know we've got to earn a living here, but she's traveling a lot and she's not there with the girls and I'm relying on somebody who's not even here today to take care of those individuals, you know.

In addition, when you're talking about child pornography and, you know, a device used and things like that,

makes it very difficult. As you can see from the record, I know he's a sophisticated individual, you know, that has done very well and, you know, speaking other languages, working for the military. That gives me a lot of pause.

I want to keep an open mind here, but I'm just trying to be up front with you about what the Court's concerns are because I'm trying to figure out are there any conditions we can set or not. Again, I think the government has already conceded they're less worried about flight risk. I'm more worried about the danger to the community or the safety of the community and so help me out with that.

MR. WRIGHT: My pleasure. And one, we're not -- we're not moving the children out of the home for his benefit. If he's in custody, there's no one in the home so they would have to go to one of those locations if he's held in custody. She's not home all the time. She's back and forth so --

THE COURT: Well, when she comes home, wouldn't they be there on the weekends? I'm just -- help me out. I mean, I don't want to suppose anything here, but...

MR. WRIGHT: Uh-huh. Obviously Your Honor doesn't want to disrupt them, but what I'm saying is with her current work, the way she goes Monday through Thursday, Tuesday through Friday, she's back and forth into Georgia and obviously can come back on some of those nights, but not all of those nights. And then he also works also and then he's

been deployed at times also so this is -- as a military -- kind of a military family type role, they don't always -- she's a linguist also, Your Honor.

THE COURT: Yes, I saw that in her letter.

MR. WRIGHT: So they don't -- and I was a military brat growing up. There's adjustments. There's movement. There's times when you move. They believe they can do this without causing them any kind of turmoil, any kind of trauma, anything that's going to impact their grades, affect their social growing, cause them to have to change schools.

Now, if -- she also -- there's the possibility she could even -- even if she was able to arrange over time to get a situation to come back, find him another place or do something. But for the current time, it just seems like what the kids normally do in terms of spending time with the local relatives and what they would have to do if he was kept in custody, so it doesn't -- him being released is not what causes them to have to be at those places, especially during those days that she travels.

When she returns, if Your Honor is concerned, I think them being able to come back to the home during days that she's there or something like that, honestly, that I had not contemplated. We can -- obviously the mother could still see them at her sister's or their aunt's house, but in terms of their -- you know, the home, so to speak, I think in order

for them to make that type of arrangement, her job would have to -- she would have to make some type of adjustment with her work so that's not something that would be instant if that was a concern.

Maybe finding him -- as far as finding him a separate apartment, I don't think that's financially feasible with her having to stay and work -- stay in Georgia and maintain a place there, the home here that they've been purchasing since 2022, maintain that, and maintain a separate residence also. And again, obviously, him not staying with one of those family members that may have children.

So it's not a perfect -- it's not a perfect situation, but, again, in terms of being able to protect the children, that can be done. There will be some inconvenience. There will be some -- maybe it will be, you know, ten minutes longer to get to school or something like that. Those things will happen.

And I think in talking with them -- I spent a great deal of time talking with him, talking with her. They're very engaged. The family is aware. They weren't aware of details that weren't provided in the indictment and not until this morning, but they know the nature. And again, this isn't a new circumstance. This didn't just come up out of the blue. This investigation has been going on for a year and a half so they've been aware that, you know, these charges might come or

this day might come.  So it's not like this is being -- this is a secret that the family and extended family is not aware of.

So in terms of the conditions, I think his placement in the home, I think that would be the best situation as far as -- as far as now.  We can always review that.  Obviously, a condition of no electronic devices, no laptops in the home.  There could be -- if the Court felt no cell phones or anything would be appropriate, we could do that.  She's already said they could arrange to put a landline in the house if the Court was comfortable with that.  They basically indicated absolute flexibility in terms of whatever conditions, we will meet them.  We'll figure out a way.  We're working as a team.  We're working as a family and we're going to find a way to march through this difficult situation.  So that's -- whatever we need to do, we'll work it out.  Usually we only have one option available which would be easier to present to the Court.

But in terms of -- I do believe there are conditions.  With the flight risk being kind of settled, him being in a home where no minors are present, the Court could order him not -- I don't know what the Court wants to do in terms of his contact with the relationship with the -- with her two daughters, the stepchildren.  The Court -- they're agreeable with whatever the Court wants.  If the Court wants

to say they're only to be around him in the presence of the mother, if the Court wants to say that he's just not to be physically present around them, whatever the Court -- whatever gives the Court confidence to the community, they're willing to follow that plan to a T.

Obviously warrantless searches. Check to make sure there's no electronics -- no electronics in the house. The Court could even order if she's present, she doesn't take a laptop or cell phone into the house. That has to stay locked up in her vehicle if she's there. But we can do it. It can -- it may take a combination of conditions, but I believe that those conditions can be set.

THE COURT: Thank you, Mr. Wright.

All right. Ms. Ford, just one final question for you if you could come on up to the podium.

All right. So he doesn't have any criminal history. We're all in agreement on that, right? Or a traffic ticket. Can there be conditions set here or not?

MS. FORD: My opinion is no. I mean, there's been a lot of focus on whether he has contacts with minors and that's a valid concern based on the chats that he had with the ex-girlfriend. But, I mean, he was involved in a child pornography offense while he was working for the Department of Defense on a military installation which requires some chutzpah. It's, in my opinion, pretty easy to be involved in

an internet-based crime. Even if you say you can't have a computer, you can't have a phone, it's really easy to get one.

His wife was around while he was doing it so to me, that just speaks volumes about him. The fact that he's working for a defense contractor on a military installation, doing it while his wife was around. He seems pretty comfortable just doing it out in the open.

So I am concerned that he'd continue to do it and if he had some contact with children based on what he said in those chats, I'm worried about that too.

So I stand by my original opinion that, no, there aren't any conditions or combination of conditions.

THE COURT: All right. Mr. Wright, I saw that the defendant just spoke to you. It sounds like he might have wanted to add something. Is there anything else you wanted to add to the record before the Court rules?

MR. WRIGHT: If I can have a moment --

THE COURT: Yes.

MR. WRIGHT: -- just to speak with him.

(Counsel and defendant conferred.)

MR. WRIGHT: Your Honor, just that, again, we do think -- obviously, internet access and those things are available. One thing that might help with that, again, along with ordering him to not have those things in his possession, along with electronic monitoring, the Court could even order

home detention and also order, again, that no one is allowed to bring electronics on to the property. We can keep that there. Obviously the probation could pop up at any time. The Court knows exactly what would happen if they did a search and he was in possession of anything.

And I think the wife being here is good. It makes it clear that if she's at the residence, she doesn't take a laptop inside to work or take a cell phone inside to work. His only cell phone was seized so he doesn't have one at this point.

I just think that we can keep someone away from electronic devices without them being in custody. It's not a difficult thing to do, especially with home -- yeah, with home detention, monitoring, searches, and clear instructions from the Court. We can protect the community without him being in a cage and him being able to be accessible and to deal with all this -- the kind of technical data of this.

So without the flight risk, I think the electronic situation being a concern, not a touching thing, complete separation is not difficult, Your Honor. And again, it's not one condition but the combination of conditions between being at home, whether it's just electronic monitoring or whether it's also home detention, whether it's no electronics allowed on the property at any time, those things can all be put into place and actually can be monitored without a great deal of

difficulty.

THE COURT: All right. Thank you, Mr. Wright.

All right. First of all, thank you for being here to the wife. I know this is probably not easy for your family right now.

Mr. Wright, I thought you did a very nice job for your client. You made all of the arguments. This is a tough case when he doesn't have any criminal history.

However, the Court is still going to issue an order of detention today. I don't take this lightly. I'm going to do my full reasoning in an order. You heard some of this on the record today of what my concerns were and I just can't in good conscience find conditions that can be set in a case like this under these circumstances that are alleged.

Of course, you are innocent until proven otherwise. I want you to know that, but the Court is looking at this through flight risk, which I find you are not a flight risk. The government didn't contend that you were in any event. But the safety of the community, I'm really concerned about a couple aspects the Court went into, and I'll further enumerate that in the written order that I do, Mr. Wright, okay.

MR. WRIGHT: All right. If I could just briefly ask.

THE COURT: Yes.

MR. WRIGHT: Would the Court, in terms of -- can I

stay here?

THE COURT: You may. Go ahead.

MR. WRIGHT: Because we had some discussion about the house and displacing the children. Would the Court be equally concerned if he was -- if arrangements were made for him to have a separate residence or would that impact the Court's calculations?

THE COURT: Here's what I'll say. The Court will issue its ruling with its findings and if you wish to later make a motion, it's always your prerogative. If you can argue a change in circumstances, you're always welcome to make that argument. I'm going to make my ruling today on what the record is before me and I'll put my full reasoning into the written order. If you want to file a motion later, you're always welcome to do so. I can't say how the Court will rule or if it will take it up, but you're always welcome to do that.

MR. WRIGHT: Thank you. I was just trying to get some guidance on if that would be helpful or is pointless to do or arrange, that that would not be helpful. Just trying to get --

THE COURT: I think it's completely up to you --

MR. WRIGHT: Okay.

THE COURT: -- once I issue my ruling.

MR. WRIGHT: Thank you, Your Honor.

THE COURT: All right. Appreciate it.

All right. Thank you all. Thank you, sir.

(End of proceedings.)

*****

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NORTH CAROLINA

CERTIFICATE OF REPORTER


I, Cheryl A. Nuccio, Federal Official Realtime Court Reporter, in and for the United States District Court for the Western District of North Carolina, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


Dated this 10th day of February 2026.



s/Cheryl A. Nuccio
_____
Cheryl A. Nuccio, RMR-CRR
Official Court Reporter